

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

IN THE MATTER OF THE SEARCH OF:
25 Belle Circle,
West Haven, Connecticut

Case No. _3:19-mj-733 (RMS)_

## AFFIDAVIT IN SUPPORT OF AN
## APPLICATION UNDER RULE 41 FOR A
## WARRANT TO SEARCH AND SEIZE

I, Michael Manganiello, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.     I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises known as 25 Belle Circle, West Haven, Connecticut, hereinafter "PREMISES," further described in Attachment A, for the things described in Attachment B.

2.     I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent authorized to enforce criminal laws and duly authorized by the Attorney General to request a search warrant.

3.     I have been employed as a Special Agent of the U.S. Department of Homeland Security, Homeland Security Investigations ("HIS") since 2009, and am currently assigned to the Office of the Resident in Charge, New Haven, Connecticut.  As a Special Agent with HSI, I am responsible for investigating and enforcing violations of federal law to include crimes against children as well as the enforcement of federal narcotics laws, immigration laws, the Money Laundering Control Act, and various customs violations.

4.      I have attended and graduated from the Criminal Investigator Training Program and the ICE-HSI Special Agent Training Program, both of which are conducted at the Federal Law Enforcement Training Center in Glynco, Georgia.   At this institution, I received specialized training including, but not limited to, the following areas: narcotics investigations, immigration investigations, fraud investigations, cyber investigations, import/export investigations, child pornography investigations, firearms, defensive tactics, surveillance, and undercover operations.

5.      I have participated in numerous criminal investigations of federal and state offenses including Narcotics Smuggling, Internet-based Child Pornography, Money Laundering, Human Smuggling, Counter-Proliferations, Intellectual Property Rights, and Immigration Document and Benefit Fraud.   In the course of those investigations, I participated in interviews of witnesses and subjects in criminal cases; and the execution of numerous search warrants of personal residences and personal property, including those for which I was the affiant.

6.      During my tenure with HSI, I have participated in numerous joint inter-agency investigations.   During these investigations, I have conducted physical surveillance, executed search and seizure warrants, reviewed tape-recorded conversations and conducted record checks of suspects. I have also analyzed the contents of seized cellular telephones and interviewed sources of information, including confidential sources. Through my training and experience, including on-the-job discussions with other law enforcement agents and cooperating suspects, I am familiar with the operational techniques and organizational structure of drug, weapons, currency, and human smuggling organizations.

2

7.      The information in this affidavit includes facts known personally to me, as well as facts that I have learned from other agents directly involved in the investigation, as well as my review of reports and other documents.

8.      This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## APPLICABLE LAW OF CRIMES UNDER INVESTIGATION

9.      I submit this affidavit in support of an investigation into crimes including, but not limited to, violations of the following statutes.

10.     **Wire Fraud (18 U.S.C. § 1343):** "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both."

11.     **Attempt and Conspiracy (18 U.S.C. § 1349):** "Any person who attempts or conspires to commit any offense under this chapter [including 18 U.S.C. § 1343] shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy."

12.     **Aggravated Identity Theft (18 U.S.C. § 1028A(a)(1)):** "Whoever, during and in relation to any felony violation enumerated in subsection (c) [including 18 U.S.C. § 1343],

knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person shall, in addition to the punishment provided for such felony, be sentenced to a term of imprisonment of 2 years."

## PROBABLE CAUSE

### Background

13.     In March 2018, HSI Detroit initiated an investigation into a group of individuals who referred to themselves as "The Community." The Community was a loosely organized group of individuals dedicated to online identity theft.  Its members specialized in a tactic known as "SIM Hijacking" or "SIM Swapping."

14.     This tactic enabled The Community to gain control of a victim's mobile phone number by linking that number to a subscriber identity module ("SIM") card controlled by The Community—resulting in the victim's phone calls and short message service ("SMS") messages being routed to a device controlled by a member of The Community.[1]

15.     Upon gaining control of a victim's mobile number, one or more members of The Community would proceed to access an online account of the target by either (1) cracking (or stealing) a password and then requesting a two-factor authentication ("2FA") code be sent to the impersonating device or (2) requesting that a password be reset via a text message.  Once an initial

---

[1] SIM Hijacking was often facilitated by bribing an employee of a mobile phone provider.  Other times, SIM Hijacking was facilitated by "social engineering": a member of The Community would contact a mobile phone provider's customer service—posing as the victim—and request that the victim's phone number be swapped to a SIM card (and thus a mobile device) controlled by The Community.

account—typically an email—was compromised, The Community would next seize control of additional accounts by resetting additional passwords linked to the account that they now controlled.

16.     During these attacks, one or more members of The Community would appropriate the online identity of the victim, using means of identification including the victim's name, email, and mobile phone number.

17.     Members of The Community planned and organized their activities on various online forums and over diverse channels of communication.   Broader discussions—such as discussing the manner and means of attacks generally, and networking among The Community's members—typically took place on forums such as "OGUsers" and "Hackforums." Planning and execution of specific attacks, as well as victim selection and recruiting, usually took place via platforms such as Discord, Skype, Signal, Wickr, and Telegram.   These services can be accessed by the use of computers, as well as by mobile devices such as phones and tablets.

18.     The investigation revealed that a subset of The Community conspired to specialize in the theft of cryptocurrency.[2]   These individuals engaged in SIM Hijacking with the goal of gaining control of—and stealing—a target's cryptocurrency.

---

[2] Cryptocurrencies, also known as virtual currencies or digital currencies, are online media of exchange.  The most famous is Bitcoin, but many others exist—such as LiteCoin and Ethereum.  Like traditional currency, they act as a store of value and can be exchanged for goods and services.  They can also be exchanged for dollars.  But, unlike "fiat" currencies such as the dollar, they are untethered from the traditional banking system and neither issued nor backed by sovereign states. Their value depends only on the law of supply and demand.

19.     The conspirators would conduct research to identify targets for SIM Hijacking that were publicly associated with cryptocurrency, such as investors or promoters.  The assumption of the conspirators was that these individuals would have substantial cryptocurrency holdings.

20.     If the conspirators were able to successfully hijack a target's phone number, they would use the techniques above to steal the target's cryptocurrency.

21.     In May 2018, a member of The Community was arrested and began cooperating with law enforcement.  Through him, law enforcement gained access to records of online chats between members of The Community.  Search warrants were subsequently issued that enabled the review of further online chats between members of The Community.

22.     Through review of online chats discussing the planning and execution of cryptocurrency thefts, law enforcement identified victims of The Community.  Victims were interviewed and their losses substantiated.

23.     Law enforcement also reviewed logs provided from mobile phone providers and online service providers that revealed unauthorized access to victims' phone services as well as email, cloud storage, and cryptocurrency exchange accounts. In numerous instances, law enforcement was able to identify an IP address or addresses[3] that one or more attackers used to access a victim's online accounts.

---

[3] The Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address looks like a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a

24.     This investigation has shown that members of The Community have been responsible for thefts of cryptocurrencies in excess of $2,400,000 (as valued at time of theft).  The thefts were coordinated and executed via the Internet utilizing several internet platforms, to include Discord,[4] with the intent to hide or disguise the members' true identities.  Proceeds from the cryptocurrency thefts were disbursed electronically and in anonymity due to the nature of cryptocurrency transactions.

**Ryan Stevenson (aka "Phobia")**

25.     Through review of online chats and through interviews, Discord user "Deleted User e672ea68#8549", User ID 312350561225801728 was identified as a member of the Community who enabled SIM swapping and cryptocurrency theft by other members of the Community.

26.     On or about September 10, 2018, an HSI Detroit Task Force Officer received a search warrant response from Discord that included Discord user "Deleted User e672ea68#8549", User ID 312350561225801728.  This response included chat history and IP addresses associated to "Deleted User e672ea68#8549".

27.     An HSI Detroit analyst reviewed the content from chats for "Deleted User e672ea68#8549".  This review identified that "Deleted User e672ea68#8549" was referred to as "Phobia" by members of The Community.  "Deleted User e672ea68#8549" also referred to himself

---

range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

[4] Discord is a proprietary freeware voice over internet protocol application specializing in text, image, video and audio communication between users in a chat channel.

as RYAN STEVENSON.  In the chats, "Deleted User e672ea68#8549" also provided his personal email as okphobia@gmail.com.    This review further identified that "Deleted User e672ea68#8549" has been involved in The Community since at least July 2017.

28.     During the course of the investigation, Discord user "Deleted User e672ea68#8549" was identified as RYAN STEVENSON of West Haven, Connecticut.

29.     On February 21, 2019, a cooperating individual ("CI") who is a member of The Community advised HSI Detroit that Phobia's name is RYAN STEVENSON.  The CI stated that STEVENSON was approximately 27 years old and lived in Milford, Connecticut.  The CI stated that STEVENSON had provided his name to him before, and the CI knew that STEVENSON previously had been doxed.[5]

30.     The CI further stated that STEVENSON finds exploits in websites.  The CI stated that STEVENSON had access to T-Mobile employee tools, and that STEVENSON found an asset referred to as the "Sprint prepaid tool."  The CI stated that STEVENSON would get PIN codes for victims' phone accounts, which STEVENSON would then provide to other members of The Community.  The CI stated that STEVENSON might be paid approximately $100 to access an individual's PIN, but he did not get a cut of the cryptocurrency that members of The Community stole.

---

[5] "Doxing" is the practice of publicly posting details about the real identity of an online persona.  Typically, this is done as an act of revenge, although it can also be done merely for amusement.

31.     The CI further stated that STEVENSON also found an application program interface ("API") exploit for T-Mobile, which did not require him to sign into the T-Mobile employee tools; according to the CI, this exploit allowed STEVENSON to see names, PIN numbers, and account numbers.  The CI stated that STEVENSON and another known member of The Community would sell that information.

32.     The CI further stated that STEVENSON had both Discord and Skype, where he was referred to as "Phobia".  The CI stated that STEVENSON would change accounts on Discord and Skype all of the time.  The CI stated that STEVENSON had the Skype username "Ryan"; the CI thought that STEVENSON hacked this account.

33.     The CI further stated that STEVENSON may have been part of his SIM swaps, but he did not recall STEVENSON in his chats. However, the CI knew that three known members of The Community that the CI worked with, including RICKY HANDSCHUMACHER and CONOR FREEMAN, bought PIN codes from STEVENSON.

34.     From the Discord search warrant response, an HSI Detroit analyst compiled IP addresses of session logins for "Deleted User e672ea68#8549", which included IP address 67.84.43.255 between January 31, 2018 at 00:30:25 UTC and May 24, 2018 at 23:45:07 UTC. The internet service provider for this IP address was identified as Optimum Online in the vicinity of Milford, Connecticut.

35.     On or about October 5, 2018, an HSI Detroit Task Force Officer received a response from Optimum Online for IP address 67.84.43.255.  The subscriber records for this IP address

returned to Terri Stevenson, 5 Union St, Milford, CT 06460, with a billing address of 25 Belle Circle, West Haven, CT 06516.  According to a commercial database, RYAN STEVENSON was associated to 25 Belle Circle, West Haven, Connecticut as of August 2018.

36.     On April 4, 2019, Coinbase provided a subpoena response that included an account with name "Phobia" and email okphobia@gmail.com.  The identity on the account was RYAN STEVENSON, date of birth XX/XX/1992, SSN XXX-XX-7397, address 5 Union Street, Milford, Connecticut, and ID number 228767237.  According to the event log for the account, there were 138 events from IP address 67.84.43.255 between January 31, 2018 and June 17, 2018, and 238 events from IP address 73.167.42.254 between July 27, 2018 and December 18, 2018.  As detailed supra, IP address 67.84.43.255 is subscribed to 5 Union St, Milford, CT 06460, with a billing address of 25 Belle Circle, West Haven, CT 06516.  IP address 73.167.42.254 returned to the internet service provider Comcast in the vicinity of West Haven, Connecticut.

37.     On April 22, 2019, a United States Postal Inspection Service Inspector provided change-of-address information showing that "Mel Stevenson" moved from 5 Union St, Milford Connecticut to 25 Belle Circle, West Haven, Connecticut effective July 18, 2018.

38.     On April 24, 2019, a United States Postal Inspection Service Inspector provided change-of-address information showing that "Ryan Stevenson" moved from 5 Union St, Milford, Connecticut to 25 Belle Circle, West Haven, Connecticut effective July 18, 2018 and further provided that "Ryan Stevenson" currently receives mail at 25 Belle Circle, West Haven, Connecticut.

10

39.     On April 25, 2019, a United States Postal Inspection Service Inspector identified a parcel addressed to "Ray Stevenson" based on postal databases. The parcel had tracking number 9274890983116136817621 and was delivered to 25 Belle Circle, West Haven, Connecticut. The parcel was scanned delivered on March 30, 2019.

40.     On April 26, 2019, an HSI Detroit analyst identified Connecticut Driver's License number 228767237 for RYAN STEVENSON with a date of birth of XX/XX/1992. This Driver's License shows STEVENSON's residential address as 5 Union St, Milford, Connecticut.

41.     On May 1, 2019, the undersigned conducted physical surveillance at 25 Belle Circle, West Haven, Connecticut. At approximately 3:55 p.m., the undersigned observed RYAN STEVENSON, an adult male (likely STEVENSON's father), and an adult female (likely STEVENSON's mother) in the driveway in front of the house.

**25 Belle Circle, West Haven, Connecticut**

42.     The PREMISES—located at 25 Belle Circle, West Haven, Connecticut—are a single-family house with an attached one-car garage and a detached shed or outbuilding. The PREMISES are a beige color with siding on the top and brick (or faux-brick) on the bottom. On the siding, to the left of the front door, the number "25" appears in black. There is a black mailbox at the front of the house, with the number "25" in white. Photographs of the PREMISES are appended to Attachment A and incorporated herein.

**Victim TG**

43.     On August 14, 2018, an AT&T investigator provided information on IMEIs suspected to be involved in SIM swapping to an HSI Detroit analyst. This information showed that on April 30, 2018, a new SIM card was activated for phone number XXX-XXX-2117 (TG's mobile phone number) on IMEI 358813055575272.   During the course of the investigation, a device with IMEI 358813055575272 was connected to multiple unauthorized SIM swaps.

44.     On or about April 30, 2018, STEVENSON, as Discord user "Deleted User e672ea68#8549", participated in a Discord chat furthering a scheme to defraud victim TG of his cryptocurrency.   On April 30, 2018, CONOR FREEMAN stated "$1,000" then provided phone number XXX-XXX-2117 directly to STEVENSON.   STEVENSON responded with Bitcoin address XXXX2xtjYu.   FREEMAN then stated, "ill send 10% cut if I make anything".   Based on the undersigned's training, experience, and knowledge of this investigation, I understand this Discord chat to indicate that CONOR FREEMAN offered to pay RYAN STEVENSON $1,000 for the PIN of victim TG's cell phone account and a 10% portion of any stolen cryptocurrency after a successful SIM Hijacking. An HSI Detroit analyst verified two Bitcoin transactions on April 30, 2018 to XXXXXxtjYu in the amounts of 0.03215276 BTC and 0.0750231 BTC.   The total value of the sent Bitcoin as of April 30, 2018 was approximately $1,000.

45.     On April 16, 2019, an HSI Detroit Special Agent spoke to victim TG. TG confirmed that on or about April 30, 2018, he lost access to his cell phone.   TG stated he lost access to various accounts, such as email and social media.   TG confirmed he dealt in cryptocurrency.

**Victim NM**

46.     On August 14, 2018, an AT&T investigator provided information on IMEIs suspected to be involved in SIM swapping to an HSI Detroit analyst. This information showed that on May 1, 2018, a new SIM card was activated for phone number XXX-XXX-9211 (NM's mobile phone number) on IMEI 352028064085124.  During the course of the investigation, a device with IMEI 352028064085124 was connected to multiple unauthorized SIM swaps.

47.     On or about May 1, 2018, STEVENSON, as "Deleted User e672ea68#8549" on Discord, participated in a Discord chat furthering a scheme to defraud victim NM of his cryptocurrency.  The following chat took place on May 1, 2018 between CONOR FREEMAN and STEVENSON:

| Time (UTC) | User | Contents |
|---|---|---|
| 03:46:17 | FREEMAN | phobia |
| 04:50:04 | STEVENSON | hi |
| 04:50:12 | FREEMAN | i need a pin |
| 04:50:22 | STEVENSON | again? |
| 04:50:25 | FREEMAN | yes |
| 04:50:34 | STEVENSON | different person? |
| 04:50:38 | FREEMAN | yes |
| 04:50:41 | STEVENSON | ok |
| 04:50:48 | STEVENSON | same deal or na |
| 04:50:52 | FREEMAN | hell no |
| 04:50:55 | FREEMAN | he can get 300 |
| 04:51:10 | STEVENSON | wut about me 😟 |
| 04:51:19 | FREEMAN | uou can get smth if i make money |
| 04:51:24 | FREEMAN | im out of 1k |
| 04:51:25 | FREEMAN | from last time |
| 04:51:28 | STEVENSON | oh ok |
| 04:51:35 | STEVENSON | wutys the phone |

| 04:51:38 | FREEMAN | ask if hell do this for free |
|---|---|---|
| 04:51:49 | FREEMAN | (XXX) XXX-9211 |
| 04:52:11 | STEVENSON | why not 300> it goes to him |
| 04:52:19 | FREEMAN | cause i gave him 1k last time |
| 04:52:21 | FREEMAN | for nothi |
| 04:52:21 | FREEMAN | ng |
| 04:52:32 | STEVENSON | u offered that though |
| 04:52:36 | FREEMAN | i know |
| 04:52:39 | FREEMAN | and he was asking for 300 |
| 04:53:00 | STEVENSON | wut about just 200 |
| 04:53:04 | FREEMAN | 100 |
| 04:53:12 | STEVENSON | 200 |
| 04:53:37 | STEVENSON | normally im getting him 500 |
| 04:53:41 | STEVENSON | per pin |
| 04:53:44 | FREEMAN | ok 200 |
| 04:53:49 | STEVENSON | alright |
| 04:53:56 | STEVENSON | can u get pp or na |
| 04:53:57 | STEVENSON | jw |
| 04:54:02 | FREEMAN | nop oly have btc |
| 04:54:06 | STEVENSON | ok thats fine |
| 04:54:27 | STEVENSON | u just need pin |
| 04:54:29 | STEVENSON | right |
| 04:54:35 | FREEMAN | yes |
| 04:54:38 | FREEMAN | plesae |
| 04:54:42 | STEVENSON | ok |
| 04:58:05 | STEVENSON | i just msged him |
| 04:58:21 | STEVENSON | going to use restroom brb |
| 05:00:28 | STEVENSON | yo |
| 05:00:31 | STEVENSON | i got it |
| 05:00:34 | FREEMAN | what is it |
| 05:00:36 | STEVENSON | XXXX [PIN code] |
| 05:01:54 | STEVENSON | XXXX4tRAZ |
| 05:07:44 | STEVENSON | ? |
| 05:07:50 | FREEMAN | ill pay when its done |
| 05:08:02 | STEVENSON | u dont trust me? |

| 05:08:06 | FREEMAN | no i do |
| 05:08:09 | FREEMAN | im just busy rn |
| 05:08:16 | STEVENSON | oh ok |
| 06:01:12 | FREEMAN | can u ask him for the name |
| 06:01:14 | FREEMAN | on the line |
| 06:01:23 | STEVENSON | ugh ok |
| 06:01:37 | STEVENSON | full name? |
| 06:01:41 | FREEMAN | yes |
| 06:02:34 | STEVENSON | alright i msged him |
| 06:02:41 | FREEMAN | nvm i got it |
| 06:02:52 | STEVENSON | ok |
| 06:21:33 | STEVENSON | gonna eat then ill be back keep me updated |
| 06:47:59 | STEVENSON | k back |
| 08:38:29 | FREEMAN | yo |
| 08:38:31 | FREEMAN | send addy |
| 08:38:41 | STEVENSON | ok |
| 08:38:43 | STEVENSON | 1sec |
| 08:40:08 | STEVENSON | XXXX4tRAZ |

Based on the undersigned's training, experience, and knowledge of this investigation, CONOR FREEMAN requested from RYAN STEVENSON a PIN for the account associated with phone number (XXX) XXX-9211. They negotiated a price of $200 in cryptocurrency. During those negotiations, FREEMAN referenced the $1,000 in cryptocurrency that he paid the last time, likely referring to the events described in paragraph 44. STEVENSON twice provided the Bitcoin address of XXXX4tRAZ for the $200 payment. FREEMAN later requested—and then withdrew his request for—the full name of the account holder associated with phone number (XXX) XXX-9211.

15

48.     An HSI Detroit analyst verified a Bitcoin transaction on May 1, 2018 to XXXX4tRAZ in the amount of 0.02217506 BTC.  The total value of the sent Bitcoin as of May 1, 2018 was approximately $200.

49.     On or about April 5, 2019, Gemini, a U.S.-based cryptocurrency exchange, provided a subpoena response that included NM's account information, transaction history, and IP history.  Account notes for NM's account showed that there was a new device used to login on May 1, 2018.  The transaction history for NM's account showed two debits on May 1, 2018 between approximately 19:17 UTC and 19:25 UTC.  The first debit was in the amount of 5.36159062 BTC sent to Bitcoin address XXXXPwTib.  The second debit was in the amount of 0.218615 ETH and sent to Ethereum address XXXX62986.  The value of the withdrawn cryptocurrency at the time of transfer was approximately $48,291.43.

50.     An HSI Detroit analyst identified that Bitcoin address XXXXPwTib was previously provided in Discord chats by CONOR FREEMAN.

51.     In an interview with NM on May 1, 2019, NM confirmed that 5 BTC and some ETH were stolen from NM. In addition, NM stated that NM provided an additional 2 BTC to get his passwords back.

**Victim JP**

52.     On August 14, 2018, an AT&T investigator provided information on IMEIs suspected to be involved in SIM swapping to an HSI Detroit analyst. This information showed that on May 7, 2018, a new SIM card was activated for phone number XXX-XXX-7474 (JP's mobile

phone number) on IMEI 353307082330483.  Based on search warrant returns from AT&T, on May 7, 2018, this IMEI was located in the vicinity of Hoschton, Georgia.  A known member of The Community lives in the Hoschton, Georgia area, while JP does not.

53.   Between approximately May 3, 2018 and May 4, 2018, STEVENSON, "Deleted User e672ea68#8549" on Discord, participated in a Discord chat furthering a scheme to defraud victim JP of his cryptocurrency.  On May 3, 2018, CONOR FREEMAN provided JP's phone number to STEVENSON and asked him to provide the PIN code.  On May 4, 2018, STEVENSON claimed that he was "getting it [the PIN] today".  STEVENSON later claimed that he was "waiting for him to get out" and "I know he got the pin for the one yesterday".

54.   Investigation into verifying if JP's accounts had been taken over (hacked) revealed that on or about May 7, 2018, members of The Community conspired to seize control of JP's cryptocurrency wallet and $1,669.56 (valued at the time of the attack) worth of cryptocurrency was stolen from his cryptocurrency wallet.

55.   On October 2, 2018, JP emailed HSI Detroit regarding the theft of his cryptocurrency. JP provided the following information in the body of the email: "Per our conversation yesterday, below is the information related when my phone was hacked.

Blockchain Wallet: Hacked on May 7 2018 @ 4:57 PM 1 BCH (Valued at 1,762) was sent to XXXXsqxhl8

Coinbase Wallet: Was logged in 5 months ago from a Chrome Mac IP address 91.207.61.18 Nothing was taken

Bittex Exchange: Was logged in on 05/07/18 IP address 91.207.61.18 Nothing was taken

The only money they got was off my blockchain wallet. They also got into my twitter

account on 05/07/18 My main twitter account @crypXXXXXXXX has a big following so that

may be why they targeted me and hacked my phone." Based on the undersigned's training,

experience, and knowledge of this investigation, I understand victim JP to be confirming three

instances of unauthorized access into his cryptocurrency wallet(s). Two of these instances did not

result in any loss of cryptocurrency, but the third resulted in a loss of approximately $1,762 in

Bitcoin.

56.     Blockchain analysis into the Bitcoin Cash address provided by JP verified the 1.0

BCH transfer.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

57.     As described above and in Attachment B, this application seeks permission to

search for records that might be found on the PREMISES, in whatever form they are found.  One

form in which the records might be found is data stored on a computer's hard drive or other storage

media.  Thus, the warrant applied for would authorize the seizure of electronic storage media or,

potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

58.     *Probable cause.*  I submit that if a computer or storage medium is found on the

PREMISES, there is probable cause to believe those records will be stored on that computer or

storage medium, for at least the following reasons:

18

a.   Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.   Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system also may keep a record of deleted data in a "swap" or "recovery" file.

c.   Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users

19

typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

d.  Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

59.  *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the PREMISES because:

a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record

information about the dates files were created and the sequence in which they were created, although this information later can be falsified.

b. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

    i. In my training and experience, information stored within a computer or storage media (e.g., registry information, personal communications, personal images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

    ii. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner.

    iii. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log:

computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation.

iv. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user.

v. Information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's

motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.   A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.   The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.   Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.  For example, the presence or absence of

counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

f.   I know that when an individual uses a computer to obtain unauthorized access to a victim's online accounts over the Internet, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime.  The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense.  The computer is also likely to be a storage medium for evidence of crime.  From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

60.   *Necessity of seizing or copying entire computers or storage media.*  In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media.  Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.  Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage

media, and to prevent the loss of the data either from accidental or intentional destruction.  This is true because of the following:

    a.   The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site.  Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence.  Storage media can store a large volume of information.  Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

    b.   Technical requirements.  Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations.  Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.  The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

    c.   Variety of forms of electronic media.  Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

61.   *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

62.   Because RYAN STEVENSON shares the PREMISES as a residence with at least his parents, it is possible that the PREMISES will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime.  If it is nonetheless determined that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

## SEARCHES FOR EVIDENCE PERTAINING TO CRYPTOCURRENCY

63.   As described *supra*, this investigation involves the theft of cryptocurrency.

64.   Cryptocurrency is stored in "wallets" both online and offline. In order to access and send the cryptocurrency stored in these wallets, the owner of the cryptocurrency must have access

to both the wallet address, also known as a public key, and the private key.  Both the wallet address and private key are lengthy, facially unintelligible, strings of letters and/or numbers.

65.     Recovery seeds are a series of random words which store the information needed to recover all of the public key-private key pairs of a cryptocurrency wallet.  Recovery seeds allow an owner of virtual currency to access his/her wallet from any electronic device.

66.     Cryptocurrency can be—but is not necessarily—stored in so-called "hardware wallets," physical devices produced by companies such as SatoshiLabs or Ledger that contain the wallet addresses and private keys necessary to access and transfer cryptocurrency. A user of such a device may store the password or passwords necessary to access such an account on a phone, computer, or other electronic storage device.

67.     Cryptocurrency can be—but is not necessarily—stored in online wallets, some of which are controlled by the operators of online cryptocurrency exchanges.  In the case of a user of an online wallet, electronic devices such as phones or computers would contain records pertaining to its access.  A user may also store the password or passwords necessary to access such an account on a phone, computer, or other electronic storage device.

68.     Some cryptocurrency owners write down their private keys, wallet addresses, recovery seeds, and/or passwords or print them out on paper and hide them in various places such as picture frames, safes, desks, etc., as backup so that they do not lose access to their wallets.

69.     Some cryptocurrency owners store their private keys, wallet addresses, recovery seeds, and/or passwords on their computers, cell phones, or other electronic storage devices.  On

an electronic storage device, such keys, addresses, and passwords can be stored in any form and—like other valuable electronic information—are sometimes concealed or encrypted.  Concealment of electronic files can take place by many means, including but not limited to renaming files, changing file extensions, hiding files in unusual places (such as among word processing documents or photographs), or using various publicly available programs to encrypt or hide them.

70.     Some cryptocurrency owners will take pictures of their private keys, wallet addresses, recovery seeds, and/or passwords and store them electronically.  Such photographs may be concealed or encrypted as described in the preceding paragraph.

71.     In my training and experience, cryptocurrency users closely control access to cryptocurrency.  The information used to access and transfer cryptocurrency—as well as the electronic devices used to do so—will typically be located on the person of a cryptocurrency user, at their home, and/or at another secure location readily accessible to the user.

72.     In my training and experience, users of cryptocurrencies—especially those that have stolen it—often convert one cryptocurrency into another.  For those that have stolen

cryptocurrency, these transfers are often done to attempt to conceal stolen funds and make them more difficult to trace.

73.     There are a myriad of cryptocurrencies, including but not limited to Bitcoin, Ethereum, Ripple (XRP), Bitcoin Cash, Litecoin, EOS, Binance Coin, Stellar, Cardano, Monero, Zcash, Dash, Dogecoin, and Verge.

## **CONCLUSION**

74.     I submit that this affidavit supports probable cause for a warrant to search the PREMISES described in Attachment A and seize the items described in Attachment B.

Respectfully submitted,

Michael Manganiello
Special Agent
U.S. Department of Homeland Security
Homeland Security Investigations

Subscribed and sworn to before me
On May 3, 2019

/S/
HONORABLE ROBERT M. SPECTOR
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A
### *Property to be searched*

The property to be searched is 25 Belle Circle, West Haven, Connecticut, further described as a single-family house with an attached one-car garage and a detached shed or outbuilding. The house is a beige color with siding on the top and brick (or faux-brick) on the bottom. On the siding, to the left of the front door, the number "25" appears in black. There is a black mailbox at the front of the house, with the number "25" in white. Three photographs of the PREMISES are appended to Attachment A and incorporated herein.







**ATTACHMENT B**
*Property to be seized*

1.    All records relating to violations of 18 U.S.C. § 1343, 18 U.S.C. § 1349, and 18 U.S.C. § 1028A(a)(1), those violations involving the group known to its members as The Community and/or RYAN STEVENSON and occurring on or after July 2017 including:

a.    Records and information relating to a conspiracy to defraud the victims identified as TG, NM, and JP;

b.    Records and information relating to the SIM Hijacking and identify theft of TG, NM, and JP;

c.    Records and information relating to the unauthorized access of the mobile phone numbers and online accounts of TG, NM, and JP;

d.    Records and information pertaining to the transfer of cryptocurrency stolen from NM and JP;

e.    Records pertaining to any and all discussions concerning SIM Hijacking, account takeovers, and the theft of cryptocurrency;

f.    Records and information relating to the Discord user "Deleted User e672ea68#8549", User ID 312350561225801728; Skype user Ryan; okphobia@gmail.com; and any username referencing "Phobia";

g.    Records and information relating to the identity or location of members of The Community that conspired to steal cryptocurrency;

h.    Records and information relating to communications with Internet Protocol addresses 67.84.43.255 or 73.167.42.254;

2.      Records and information relating to cryptocurrency wallet addresses, including any cryptographic keys, recovery seeds, or passwords—in any form—used to access those addresses through any computer programs or online exchanges;

3.      Cryptocurrency wallets, wallet addresses, hardware wallets (such as Trezor or Ledger devices), private keys, wallet recovery seeds, usernames, passwords, mnemonic pins, PGP keys, and 2FA devices;

4.      Cryptocurrencies to include, but not be limited to, Bitcoin, Ethereum, Ripple (XRP), Bitcoin Cash, Litecoin, EOS, Binance Coin, Stellar, Cardano, Monero, Zcash, Dash, Dogecoin, and Verge.  Seizure of cryptocurrency will be effectuated by (1) identifying wallets and their cryptographic keys through the seizure of information described herein, and (2) transferring the virtual currency to a government-controlled wallet.

5.      Computers, cell phones, mobile computing devices, or storage media that may have been used as a means to commit the violations described above or contain the information described above.

6.      For any computer, cell phone, mobile computing device, or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

    a.  evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing

history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b.   evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.   evidence of the lack of such malicious software;

d.   evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to the crimes under investigation and to the computer user;

e.   evidence indicating the computer user's state of mind as it relates to the crimes under investigation;

f.   evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

g.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

h.   evidence of the times the COMPUTER was used;

i.   passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

j.   documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

k. records of or information about Internet Protocol addresses used by the COMPUTER;

l. records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

m. contextual information necessary to understand the evidence described in this attachment; and

7. Routers, modems, and network equipment used to connect computers to the Internet.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high-speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

4

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the reviewing agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.